Charles G. McDONALD,
Plaintiff–Appellee,

v.

BOARD OF MISSISSIPPI LEVEE
COMMISSIONERS,
Defendant–Appellant.

No. 86–4846.

United States Court of Appeals,
Fifth Circuit.

Nov. 25, 1987.

Stephen L. Thomas, Lake, Tindall, Hunger & Thackston, Greenville, Miss., for defendant-appellant.

Charles B. Davis, Thomas, Price, Alston, Jones & Davis, Jackson, Miss., for plaintiff-appellee.

Before RANDALL, WILLIAMS and GARWOOD, Circuit Judges.

RANDALL, Circuit Judge:

Charles McDonald, an owner of land adjacent to the Mississippi River, sued the Board of Mississippi Levee Commissioners for unconstitutionally awarding maintenance contracts that granted grazing rights on a public easement underlying the river levee. The district court found that the state agency deprived McDonald of his property without compensation and in an arbitrary and capricious manner, and accordingly, the court awarded McDonald damages and an injunction. We conclude that the suit did not violate the eleventh amendment and that the district court committed no reversible errors; thus we affirm the judgment.

## I.

### Facts

In 1982, Charles G. McDonald ("McDonald"), a Louisiana resident, purchased almost 900 acres of land bordered by the Mississippi River in Washington County, Mississippi, for $325,000. McDonald received a special warranty deed from United States Gypsum Company ("Gypsum") that conveyed a fee interest subject to easements held by the Board of Mississippi Levee Commissioners (the "Levee Board"). In addition to the deed, an earlier letter from Gypsum informed McDonald that the property was subject to an easement "controlled by" the Levee Board "for Mississippi River Levee right-of-way and maintenance purposes."

Before buying the property, McDonald conducted a title search, purchased title insurance, and obtained an affidavit from Gypsum's agent concerning claims against the property. The land records contained condemnation awards for the Levee Board's easements, but no contracts concerning the property were recorded. McDonald's deed referred to a 1978 "Perpetual Easement Deed" and a 1951 deed that mentioned the Levee Board's easements and had an attached map outlining a fence along the river levee. However, McDonald stated that when he visually inspected the land before purchasing it, the riverside fence was not in place and the land was covered by tall grass. McDonald testified that none of his inquiries provided notice that the Levee Board claimed the right to appropriate grazing rights on the land.

The Mississippi Legislature incorporated the Levee Board in 1865 to build and repair levees along the river. The 1865 statutes gave the Levee Board the power to condemn private property to construct and maintain river levees and to contract for levee maintenance. Similarly, in 1890, the Mississippi Constitution mandated the maintenance of a levee system and provided:

> The levee boards shall have, and are hereby granted, authority and full power to appropriate private property in their respective districts for the purpose of constructing, maintaining, and repairing levees therein....

Miss. Const. art. 11, § 233. Pursuant to these provisions, the Levee Board acquired easements on 504 acres of McDonald's land by statutory condemnation proceedings between 1899 and 1948.[1] Most of the various condemnation awards stated that the purpose of the easements was to "build and

---

1. When the individually condemned easements are plotted according to the terms of the awards, a substantial portion of the land that the Levee Board claims is subject to easements is not included within the alleged boundaries. However, each recorded award states: "See map on file in office of the Engineer Department, Greenville, Miss." The Levee Board asserts that the referenced map accurately depicts the easements, and the map indicates that the disputed acreage is within the Levee Board's easements. At trial, the district court found that the parties to the original awards intended all of the 244 acres that are covered by maintenance contracts to be subject to the Levee Board's easements.

repair" a levee and that the Levee Board had determined the damages to the landowners. The terms of individual awards provided the cash value of what was taken; some specified whether the property was cleared land, woodland, or land with improvements and whether the amount paid included timber or structures.

Since 1952, the Levee Board has operated under its present policy of maintaining the levee by awarding contracts to third parties. The Levee Board believes that grazing cattle on the easement is necessary for proper maintenance because it creates a sod that protects the levee from erosion and keeps the grass at an acceptable height. Therefore, for at least 34 years, the Levee Board has exercised control over the grazing rights on the easements by granting these privileges in the maintenance contracts. Although the contractors do not pay for the grazing rights, the contracts enable the Levee Board to minimize its maintenance expenses.

Under the Levee Board's policy, Newman Bolls ("Bolls"), Chief Engineer of the Levee Board, selects who will receive maintenance contracts. The Levee Board has adopted written guidelines,[2] which Bolls considers when he reviews applications. However, Bolls exercises discretion in selecting contractors. For example, he does not consistently apply the written factors, and he may consider unwritten factors.[3] According to Bolls, the fact that an applicant is a servient landowner is not a significant factor.

The present system is very beneficial to the Levee Board and the maintenance contractors, and the Levee Board has received superior ratings from maintenance inspections by the Corps of Engineers. It is undisputed, however, that the system may deprive landowners of rent they could receive from leasing the grazing rights or of profits they could derive from cattle operations. Furthermore, it appears that if a landowner rented the land and maintained it according to the Levee Board's requirements, both the landowner's and the Levee Board's purposes could be met.

The Levee Board's position, however, is that to properly maintain the levee, it must exert direct supervisory control over maintenance contractors. Under the present system, some contractors have not adequately performed their contracts, and Bolls has apparently handled these problems pursuant to his authority and state statutes. In addition, according to Bolls, if a contractor fails to properly maintain the land as required by the maintenance contract, the Levee Board can cancel the contract. Criminal statutes also authorize the prosecution of a person who defaces the levee. There is no indication that these procedures would be inapplicable to a landowner or to an assignee or sublessee of a landowner.

In 1980 and 1981, the Levee Board awarded two five-year maintenance contracts covering 244 acres of the easements on McDonald's land.[4] In 1982, McDonald attempted to lease his newly acquired land that was subject to the easements for pas-

**2.** The Levee Board's "Policy for Entering Into Levee Maintenance Contracts" states:
1. Board shall select as contractor only persons who are able to satisfy the Board that they are capable of maintaining levee and right of way in accordance with contractual requirements attached.
2. Contractor selected must have equipment and plant and be prepared to carry out terms of contract.
3. Board must be satisfied that application is not submitted for purpose of transfer to some unknown person and Board will not necessarily recognize such transfer.
4. Require bond—$3.00 per station.
5. No contracts for less than 3,000 feet, unless necessity demands it.

6. It is to be understood, that contracts are to be entered into on a five year basis only, with no obligation on the Board to renew any contract, with any individual, firm or corporation after such time.

**3.** Two unlisted factors are whether the applicant is in the cattle business and whether he is a local resident or has a local agent.

**4.** The contracts expired during the course of this litigation, but the Levee Board has allowed the contractors to continue grazing cattle on the land pending the outcome of the suit and asserts that it has complete authority to determine who will hold the grazing rights.

turage to cattle owners. The person contacted by McDonald informed him of the two maintenance contracts, and upon inquiry, McDonald learned of the Levee Board's maintenance contract policy.

Based on the factors listed in the Levee Board's policy, McDonald determined that he would be unable to obtain a maintenance contract on his land. His attorney contacted Bolls, who stated that McDonald could not get a contract during the term of the existing contracts and that McDonald had no present rights in the property subject to the Levee Board's easements. Bolls said that to be eligible for future contracts, McDonald would have to operate a cattle business and live in the locality.[5] Although Bolls forwarded an application to McDonald, McDonald did not submit it to the Levee Board because he believed that applying for a contract would be futile.

## II.

### Proceedings Below

McDonald sued the Levee Board for deprivation of his constitutional rights under 42 U.S.C. § 1983. As grounds for relief, he asserted that the Levee Board denied him privileges and immunities guaranteed by the Constitution because he was a nonresident and that the Levee Board violated his fifth and fourteenth amendment due process rights. Specifically, McDonald argued that the Levee Board's appropriation of the grazing rights on the easements constituted a confiscation of his property for public use without just compensation and that, as a matter of substantive due process, the Levee Board's manner of awarding maintenance contracts was arbitrary and capricious. As pendent state claims, McDonald asserted that the Levee Board was exceeding its easement rights and violating Mississippi administrative law.

At trial, the primary issue was whether McDonald had a present property interest

in the grazing rights on the land subject to the Levee Board's easements. McDonald claimed that the Levee Board had not acquired the grazing rights by grant, condemnation, implication, or prescription and that in excluding him from these rights, the Levee Board had taken his property. McDonald argued that his fee simple title included the right to graze his land and to take profits from it because these uses were not excepted from his title. He asserted that his proposed use of the property was not inconsistent with the purpose of the easements and that the Levee Board's conduct effectively deprived him of all use of the property.

The Levee Board asserted that its easement rights included exclusive control of all land subject to the easements. The Levee Board contended that McDonald's only property interest was a possibility of reverter if the easements were no longer necessary to maintain the levee. The Levee Board argued that it obtained the right to exercise full control of the land either expressly through the condemnation proceedings, implicitly in the acquisition of a public easement, or prescriptively by the exercise of control for over ten years.

The district court, in a careful and thorough opinion, rejected the Levee Board's position. The court found that the condemnation awards for easements to build and repair a levee

> did not expressly or by implication give the Board the right to exclude the plaintiff from his own property under the guise of maintaining the levee.... [T]he Levee Board cannot rely on the terms of the easement awards to exclude the plaintiff from using his land in a manner that does not interfere with the easements to build and repair that were granted.

*McDonald v. Board of Mississippi Levee Comm'rs*, 646 F.Supp. 449, 465–66 (N.D. Miss.1986). As to an easement by prescrip-

---

**5.** At trial, Bolls admitted that a property owner could maintain the land under the Levee Board's supervision like any contractor and that a nonresident landowner could designate a local agent. However, Bolls maintained that McDonald would be an unsatisfactory contractor

because he was not in the cattle business but wanted to transfer the contract to a third party. In later testimony, Bolls relaxed his position and stated that the Levee Board might allow a transfer of a contract to someone it recognized as competent.

tion, the district court concluded that such an easement

> could not give the easement holder the right to exercise full control over the landowner's realty. Rather, even if the easements were broadened by prescription to include additional uses of the plaintiff's land, the easements, by definition, must be confined to use of another's land for a particular purpose, not for any and all purposes. In such a situation the landowner retains full dominion over his realty subject only to the easement, and the landowner may make any use of his realty that does not interfere with the easement holder's reasonable use of the easement.

*Id.* at 466. Concerning the extent of the Levee Board's easement by implication from the acquisition of a public easement, the district court concluded that grazing rights were not necessary to building or maintaining the levee. The court stated:

> [E]ven if it could be implied that the purpose for which the easements in this case were acquired was to maintain the levee, it cannot be further implied that taking away the landowner's ability to make a profit from leasing the grazing rights on the land is a use that is directly or incidentally conducive to the hypothetical implied purpose of maintenance for which the easement was acquired.

*Id.* at 470.

In short, the court concluded that because the Levee Board's easements on McDonald's land did not include grazing rights, the Levee Board's appropriation of those rights constituted a taking without compensation. The court also found that the Levee Board violated McDonald's substantive due process rights because Bolls selected contractors based on an unwritten discretionary standard and his subjective determination of who was competent.[6] The court concluded that "such broad discretion renders the maintenance policy arbitrary." *Id.* at 473. Furthermore, the court stated,

"this broad discretion combined with the Levee Board's exclusion of the landowner from using his property without compensating him results in an arbitrary infringement of the plaintiff's property rights." *Id.*

Accordingly, the court awarded McDonald $5,748.30 plus post-judgment interest and attorney's fees. The court also enjoined the Levee Board from appropriating grazing rights from McDonald and enjoined McDonald from using the land subject to the Levee Board's easements in any manner inconsistent with those easements. The Levee Board filed a timely notice of appeal from the final judgment.

On appeal, the Levee Board raises four points of error: (1) the eleventh amendment of the Constitution barred this federal suit because the Levee Board is a state agency; (2) the district court erroneously concluded that McDonald had a present property interest; (3) the district court erred in finding that the Levee Board did not compensate McDonald's predecessors for lost grazing rights; and (4) the court failed to recognize the Levee Board's right to control the use of the levee. The Levee Board presents us with a substantially different case than it argued before the district court. In addition to initiating a claim of eleventh amendment immunity, the Levee Board asserts a new legal theory: the case concerned an individual's rights in a public improvement, not a landowner's rights in a public easement. McDonald maintains that the Levee Board is not entitled to immunity and that this case, about easement rights, was correctly decided. We address in turn each of the issues raised.

## III.

### A. *Eleventh Amendment Immunity*

The Levee Board alleges that it is immune from federal suit under the eleventh

---

**6.** The court stated:

What is significant or insignificant in each case appears to be based on Boll's personal discretion. While guidelines do exist, it appears that Bolls can pick and choose which of the guide-lines are relevant and how they should be weighed. Also, he can create new unwritten guidelines as needed.

*McDonald,* 646 F.Supp. at 472–73.

amendment. The Levee Board argues that it is a state agency that has not consented to being sued in federal court. It particularly relies on the fact that the district court entered a judgment for damages, which according to the Levee Board, impermissibly imposes a liability that must be paid from state funds. *See Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). Thus in its view, the district court's exercise of jurisdiction violated the eleventh amendment, and the case must be dismissed.

 Although we normally decline to consider issues not presented to the district court, eleventh amendment immunity is a jurisdictional issue that "cannot be ignored, for a meritorious claim to that immunity deprives the court of subject matter jurisdiction of the action." *Crane v. Texas*, 759 F.2d 412, 415 (5th Cir.1985). In the absence of consent, the eleventh amendment proscribes a federal suit by a citizen against a state or one of its agencies, and "[t]his jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984).[7] The issue in this case is whether the Levee Board is entitled to eleventh amendment immunity.

 To decide the issue, we must determine whether the Levee Board is an arm of the State of Mississippi or whether it is sufficiently distinct from the state to place it beyond eleventh amendment protection. *See Jacintoport Corp. v. Greater Baton Rouge Port Comm'n*, 762 F.2d 435, 438 (5th Cir.1985) (independent local entities are not entitled to immunity "even though they exercise a 'slice of state power'.").

[T]o draw that distinction "we 'must examine the particular entity in question and its powers and characteristics as created by state law....'" The relevant factors include: (1) whether state statutes and case law characterize the agen-cy as an arm of the state; (2) the source of funds for the entity; (3) the degree of local autonomy the entity enjoys; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.

*Minton v. St. Bernard Parish School Bd.*, 803 F.2d 129, 131 (5th Cir.1986) (quoting *Clark v. Tarrant County*, 798 F.2d 736, 744 (5th Cir.1986)). Viewing these factors as a whole, we conclude that the Levee Board is not an arm of the state and is not entitled to assert Mississippi's eleventh amendment immunity.

First, Mississippi law provides little guidance concerning whether state law views the Levee Board as an arm of the state. The Levee Board emphasizes that the state constitution mandates the Levee Board's existence and removes it from legislative control, which indicates that it is an important state agency. The Levee Board also relies on *Nugent v. Board of Mississippi Levee Comm'rs*, 58 Miss. 197 (1880), decided before the adoption of the present constitution, in which the court stated that the legislature incorporated the Levee Board as a state agency to perform a public function. In McDonald's view, however, the Mississippi courts clearly view the two state levee boards as independent local agencies with the ability to levy "local improvement taxes." *Yazoo & M.V.R. Co. v. Board of Mississippi Levee Comm'rs*, 188 Miss. 889, 195 So. 704, 706 (1940). McDonald also relies on a statement in a dissenting opinion that "[t]he levee district is fundamentally a special improvement district—not a governmental agency." *Id.*, 195 So. at 708 (Anderson, J., dissenting). In actuality, neither the constitution, statutes, nor case law of Mississippi conclusively identify the Levee Board as an arm of the state.[8] A reference to the Levee Board

---

7. Upon a clear showing of congressional intent, a federal statute may also abrogate a state's eleventh amendment immunity, but section 1983 does not override the eleventh amendment. *See Quern v. Jordan*, 440 U.S. 332, 342–45, 99 S.Ct. 1139, 1145–47, 59 L.Ed.2d 358 (1979).

8. For example, McDonald cites no case in which the Levee Board and the State of Mississippi were adverse parties or in which a court al-

as an "agency" of the state by Mississippi courts does not amount to a characterization of the Levee Board as an arm of the state. *See Minton,* 803 F.2d at 131. Consequently, this factor neither weighs for or against immunity.

■ Second, because an important goal of the eleventh amendment is the protection of states' treasuries, the most significant factor in assessing an entity's status is whether a judgment against it will be paid with state funds. *See Jacintoport,* 762 F.2d at 440–41. The Mississippi Legislature has the power to provide a system of taxation for levee districts. Miss. Const. art. 11, § 237. However, the legislature must authorize an acreage tax within constitutional limits, and the Levee Board actually fixes the annual rate of taxation. *Id.* § 236. The Mississippi Supreme Court has stated that "the taxing power of the [levee] district does not, since the adoption of the Constitution of 1890, depend on a grant thereof by the legislature under its general legislative power." *Yazoo & M.V.R. Co.,* 195 So. at 705. The funds generated by the Levee Board's assessment are paid to the Levee Board, not the state treasury. *See* Miss. Const. art. 11, § 236. Thus McDonald's judgment can be satisfied by the Levee Board itself, and this factor operates against affording the Levee Board immunity.

Third, another important factor is the entity's degree of local autonomy because it measures the closeness of the entity's connection to the state and because it protects a state's public policy and internal affairs from federal interference. *Jacintoport,* 762 F.2d at 442. The Levee Board argues that it must report directly to the governor and that it performs an administrative function for the state. However, as McDonald argues, the Levee Board merely

makes an annual report to the governor showing the condition of the levees and its receipts and expenditures and recommending any legislation that it considers necessary. *See* Miss. Const. art. 11, § 235. In addition, the Levee Board must publish an itemized account of its expenditures in some newspaper of the levee district. *Id.* § 239. It does not appear that the Levee Board is under the supervisory control of any state official.

The Levee Board consists of commissioners from the counties within its levee district, and residents of the counties elect the commissioners according to county election procedures. *Id.* §§ 229, 231. The Levee Board has the power to manage the levee within its district and to cede its easements and levees, and the control of its easements and levees, to the United States. *Id.* § 232. As discussed earlier, the Levee Board has the power to levy taxes, including those "under the class known as local improvement taxes." *Yazoo & M.V.R. Co.,* 195 So. at 706. It also has the power of eminent domain, and under statutory condemnation procedures, commissioners may determine damages and compromise claims for damages. *See Nicholson v. Board of Mississippi Levee Comm'rs,* 203 Miss. 71, 33 So.2d 604, 607–08 (1948); *see also* Miss. Const. art. 11, § 233. The Levee Board performs state constitutional and federal statutory duties in maintaining the levee. In short, the Levee Board functions autonomously, and we conclude that it is sufficiently independent of the state to militate against immunity.

Fourth, this case presents a close question of whether the entity is concerned primarily with local, as opposed to statewide, problems, but we conclude that this factor also weighs against immunity. The

lowed a statute of limitation to run against the Levee Board. Such a case would treat the Levee Board and the state as separate entities. However, we note that in *Nicholson v. Myres,* 170 Miss. 441, 154 So. 282 (1934), the Mississippi Supreme Court suggested that the state could sue the Levee Board. In that case, the court stated that where the claim was that the Levee Board held title to land in violation of state law, "such illegal holding cannot be questioned ex-

cept by the state in a proceeding for that purpose." 154 So. at 283. We also note that Mississippi courts have never questioned the ability of the Levee Board to be sued, even though Mississippi only recently abolished the doctrine of sovereign immunity. *See Tradigrain v. Mississippi State Port Authority,* 701 F.2d 1131, 1133 (5th Cir.1983) (citing *Pruett v. City of Rosedale,* 421 So.2d 1046 (Miss.1982)).

Levee Board asserts that it is responsible for handling flood control in the Mississippi Delta—a problem that transcends the interests of individual counties and a major state responsibility. It argues that the state employs a system of levee districts merely as an administrative tool for remedying a problem of statewide concern. While flood control along the Mississippi River is undoubtedly important to the State of Mississippi, the problem of immediate and primary concern to the Levee Board is the maintenance of the levee within its district. The Levee Board exists to protect the land within its authority; it answers to the residents of its district; it operates on funds generated within the district. In short, it functions for the limited purpose of building, repairing, and maintaining the levees within a specific geographic area.[9]

Any governmental entity created by a state presumably exists because the state citizenry perceived a need for it, but this element of state interest, without more, does not transform every state agency into one with a statewide concern. The Levee Board argues that the Mississippi State Port Authority would enjoy eleventh amendment immunity. *See Tradigrain,* 701 F.2d at 1134 (holding that the port authority is an alter ego of the state and therefore not a citizen for the purpose of diversity jurisdiction under the same analysis used to determine eleventh amendment status). It also argues that the Mississippi State Highway Department has eleventh amendment immunity. *See Brady v. Michelin Reifenwerke,* 613 F.Supp. 1076 (S.D.Miss.1985). Therefore, it contends that the Levee Board, which similarly engages in a state function, should be immune too. McDonald responds that Mississippi drainage districts, which allegedly function like the Levee Board, do not receive eleventh amendment immunity. *See Lenoir v. Porters Creek Watershed Dist.,* 586 F.2d 1081, 1088 (6th Cir.1978). In our view, however, such sweeping comparisons cannot substitute for a careful examination of the particular entity at issue. For example, the Port of Houston Authority is immune, *Kamani v. Port of Houston Authority,* 702 F.2d 612, 613 (5th Cir.1983), while the Greater Baton Rouge Port Commission is not, *Jacintoport,* 762 F.2d at 437. If we were inclined to speak in broad generalities, we might compare the Levee Board to a Mississippi county board of education, which is not immune. *See, e.g., Adams v. Rankin County Bd. of Educ.,* 524 F.2d 928, 929 (5th Cir.1975).

Finally, even assuming that the previous factor favored immunity, the remaining factors do not. The Levee Board has the authority to sue and be sued in its own name, and it has the right to hold and use property. Thus a weighing of all the relevant factors points away from eleventh amendment immunity for the Levee Board, and we hold that the district court had the power to decide this case.

### B. McDonald's Property Interest

■ A potentially dispositive issue of McDonald's substantive claims is whether his property interest included a present right to use the surface of the land covered by the Levee Board's maintenance contracts. At trial, the parties vigorously contested this issue, and each party focused on persuading the district court that his property interest included the right to use the disputed acreage for grazing livestock. The parties framed the dispute as one between an owner of the fee and a holder of an easement, and the Levee Board, as the owner of the dominant estate, took the position that it had the superior right to use the land in the proposed manner. The district court carefully analyzed Mississippi property law and rejected each of the Levee Board's arguments concerning how it allegedly acquired the grazing rights on McDonald's land. *See* 646 F.Supp. at 463–71.

---

**9.** We note the Levee Board's reference to *Clark v. Tarrant County,* 798 F.2d 736, 745 (5th Cir. 1986), for the proposition that because a statewide program is administered by local districts, one of the program's agencies is not necessarily limited to local problems. In *Clark,* the court held that a county probation department, part of a state probation program administered by judicial districts, was entitled to eleventh amendment immunity. In this case, by contrast, the levee districts contain approximately ten of the state's eighty-two counties, and Mississippi River flooding is not a problem for the entire state.

On appeal, the Levee Board essentially discards the legal theory it used unsuccessfully below and now asserts that the dispute concerns not a tract of land, but an improvement. The Levee Board argues that the disputed acreage is actually the surface of the levee and berms, structures erected on a public easement with public funds, which an owner of the fee has no right to use for his personal benefit. The Levee Board proceeds to criticize the district court for ignoring an argument that it never had the opportunity to consider.

In short, the Levee Board seeks to try the property issue anew because it has discovered a more attractive theory. We will not allow a party to raise an issue for the first time on appeal for that reason. *Citizens Nat'l Bank v. Taylor (In re Goff)*, 812 F.2d 931, 933 (5th Cir.1987). Because we decline to review a different case than the district court decided, we do not address the issue of whether an owner of land underlying a Mississippi levee has a superior right to use the public improvement. Accordingly, the Levee Board may reserve its new theory for decision in a future case, but in this case, we hold that the Levee Board waived its arguments not presented below.

### C. Just Compensation

The Levee Board asserts that when it condemned a permanent easement for levee purposes, the award of damages fully compensated the landowner for the value of the land taken. In essence, the Levee Board argues that because it acquired full use of the land underlying the easements to build a levee, the compensation paid to the landowners necessarily included payment for all lost uses, including pasturage. The Levee Board specifically notes that the district court's analysis of the compensation issue correctly applied Mississippi law concerning easements, but it argues that the court should have applied Mississippi law concerning improvements instead. The Levee Board asserts: "The district court correctly analyzed the wrong body of law."

Our answer to this argument is that the district court cannot be faulted for correctly deciding the issue presented to it. For the reasons stated above, we refuse to consider the Levee Board's new theory on appeal, and thus we will not disturb the district court's admittedly correct decision.

### D. Scope of the Levee Board's Rights

Under this alleged point of error, the Levee Board argues that the district court failed to consider the consequences of its decision. The Levee Board contends that by affording grazing rights on the levee structure to the underlying fee owner, the district court effectively destroyed an historically efficient system of maintaining the levee. Again, as in its other arguments on the merits, the Levee Board asserts that the district court should have viewed this case as one about improvements. If it had, the Levee Board argues, it would have found that the Levee Board has the right to do whatever is reasonably necessary to maintain the levee, including exercising full control of grazing rights on its surface.

Again, our answer to the Levee Board is the same. The district court thoroughly considered each argument the Levee Board presented, and we will not disturb its thoughtful decision on the basis of a legal theory asserted for the first time on appeal.

### IV.

For the above reasons, the district court's judgment is AFFIRMED.